## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YVAN RIOUX, | CASE NO.: _____ |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| -against- | |
| CALLAWAY GOLF COMPANY, JOHN F. LUNDGREN, OLIVER G. BREWER, SAMUEL H. ARMACOST, SCOTT H. BAXTER, JOHN C. CUSHMAN, III, LAURA J. FLANAGAN, RUSSELL FLEISCHER, ADEBAYO O. OGUNLESI, LINDA B. SEGRE, and ANTHONY S. THORNLEY, | |
| Defendants. | |

Plaintiff Yvan Rioux ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Callaway Golf Company ("Callaway" or the "Company") and members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Callaway, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger between the Company, 51 Steps, Inc. ("Merger Sub"), a wholly-owned subsidiary of Callaway, and Topgolf International, Inc. ("Topgolf") (the "Proposed Transaction").

Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2.      On October 27, 2020, Callaway and Topgolf entered into an Agreement and Plan of Merger (the "Merger Agreement"), whereby Merger Sub will merge with and into Topgolf, with Topgolf surviving the merger as a wholly-owned subsidiary of Callaway.  Pursuant to the Merger Agreement, the shares of Callaway common stock to be issued to Topgolf stockholders will be calculated using an exchange ratio based on: (i) an equity value of Topgolf of approximately $1.986 billion; and (ii) a price per share of Callaway common stock fixed at $19.40 ("Merger Consideration").

3.      On November 24, 2020, in order to convince Callaway's public common stockholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement ("Registration Statement") with the SEC.

4.      In particular, the Registration Statement contains materially incomplete and misleading information concerning: (i) the financial projections for the Company and Topgolf; and (ii) the valuation analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs").

5.      The Proposed Transaction is expected to be completed in early 2021, so the special meeting of the Company's shareholders to vote on the Proposed Transaction is imminent ("Shareholder Vote").  Therefore, it is imperative that the material information that has been omitted from the Registration Statement be disclosed prior to the Shareholder Vote, so Callaway's shareholders can properly exercise their corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Callaway's public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's common stock trades on the New York Stock

Exchange ("NYSE"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).  Further, Callaway's proxy solicitor, Innisfree M&A Incorporated is located in this District at 501 Madison Avenue, New York, NY 10022.

## **PARTIES**

10.     Plaintiff is, and has been continuously throughout all times relevant, the owner of Callaway common stock.

11.     Defendant Callaway is a Delaware corporation with its principal executive offices located at 2180 Rutherford Road, Carlsbad, California 92008. The Company's common stock trades on the NYSE under the ticker symbol "ELY."

12.     Defendant John F. Lundgren is, and has been at all relevant times, a director of Callaway and Chairman of the Board.

13.     Defendant Oliver G. Brewer is, and has been at all relevant times, a director of Callaway, its President, and Chief Executive Officer, as well as a director of TopGolf.

14.     Defendant Samuel H. Armacost is, and has been at all relevant times, a director of Callaway.

15.     Defendant Scott H. Baxter is, and has been at all relevant times, a director of Callaway.

16.     Defendant John C. Cushman, III is, and has been at all relevant times, a director of Callaway.

17.     Defendant Laura J. Flanagan is, and has been at all relevant times, a director of Callaway.

18.     Defendant Russell Fleischer is, and has been at all relevant times, a director of

Callaway.

19.     Defendant Adebayo O. Ogunlesi is, and has been at all relevant times, a director of Callaway.

20.     Defendant Linda B. Segre is, and has been at all relevant times, a director of Callaway.

21.     Defendant Anthony S. Thornley is, and has been at all relevant times, a director of Callaway.

22.     The defendants identified in paragraphs 12 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Callaway, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company, Topgolf, and the Proposed Transaction**

23.     Callaway, together with its subsidiaries, designs, manufactures, and sells golf clubs and golf balls, apparel, gear, and other products. It operates through two segments, Golf Equipment; and Apparel, Gear and Other. The Golf Equipment segment provides drivers, fairway woods, hybrids, irons, wedges and packaged sets, putters, and pre-owned golf clubs under the Callaway and Odyssey brands, as well as golf balls under the Callaway Golf and Strata brand names. The Apparel, Gear and Other segment offers golf apparel and footwear; golf accessories, including golf bags, golf gloves, headwear, and practice aids under the Callaway brand; and golf and lifestyle apparel, hats, luggage and accessories, footwear, belts, hats, socks, and underwear under the TravisMathew brand name. This segment also provides storage gear for sport and personal use, including backpacks; travel, duffel, and golf bags; and storage gear accessories, as well as outerwear, headwear, and accessories under the OGIO brand. In addition, it offers outdoor

5

apparel, such as jackets, and trousers and tops; and footwear and outdoor equipment, including packs and bags, travel bags, tents, sleeping bags, and accessories. The Company sells its products through golf retailers, sporting goods retailers, mass merchants, Internet retailers, department stores, field representatives, on-line retailers, mail order stores, and in-house sales representatives, as well as to third-party distributors in the United States and approximately 100 countries.

24.     Topgolf operates entertainment facilities. It offers amenities and services, including hitting bays, food and beverage services, monthly memberships, gift cards, space for events, games, leagues, live music, mini golf, academy, online games, and tournaments.

25.     According to the October 27, 2020, joint press release announcing the Proposed Transaction:

**Callaway and Topgolf to Combine, Creating a Global Golf and Entertainment Leader**

CARLSBAD, Calif. and DALLAS, Oct. 27, 2020 /PRNewswire/ -- Callaway (NYSE: ELY) and Topgolf Entertainment Group ("Topgolf") today announced that the companies have entered into a definitive merger agreement. Under the terms of the agreement, Callaway and Topgolf will combine in an all-stock transaction creating a global golf and entertainment leader. The number of shares to be issued is based upon an implied equity value of Topgolf of approximately $2 billion, including the 14% already owned by Callaway.

Topgolf is the leading tech-enabled golf entertainment business, with an innovative platform that comprises its groundbreaking open-air venues, revolutionary Toptracer technology and innovative media platform with a differentiated position in eSports. Topgolf generated approximately $1.1 billion in revenue in 2019 and has grown at a 30% compound annual rate since 2017. Callaway is a leader in the global golf equipment market with a scale position in active-lifestyle soft goods and a proven ability to deliver strong returns, including company growth that has exceeded golf market growth for seven consecutive years.

The companies together will be able to accelerate growth, including through:

- **Fully Funded High Growth Opportunities**: Topgolf is a high-growth platform with attractive unit economics across its businesses that will benefit from Callaway's strong financial position that can fully fund

Topgolf's    growth    plans    at    an    attractive    cost    of    capital.

- **A Highly Complementary Fit**: The two companies share a focus on golf and active-lifestyle consumers. With Topgolf's 90 million consumer touch points a year, the combined company will benefit from a compelling family of brands with reach across multiple channels including retail, venues, e-commerce and digital communities. Topgolf is introducing new players to the game of golf, a powerful trend that benefits Callaway's golf equipment and                    soft                    goods                    businesses.

- **Enhanced Resources to Accelerate Growth**: The combined company's industry-leading sales, marketing and partnership infrastructure will drive traffic, increase same venue sales and accelerate conversion of new business opportunities. Together, Callaway and Topgolf's significantly expanded consumer reach will drive increased promotion, exposure and sales of equipment    and    apparel    to    golfers    and    non-golfers    alike.

- **Innovation to Drive Long-term Potential**: A shared innovative culture creates exciting long-term opportunities including the potential to distribute content across connected screens for instruction, fitness and lifestyle.

"Together, Callaway and Topgolf create an unrivaled golf and entertainment business," said Chip Brewer, President and Chief Executive Officer of Callaway. "This combination unites proven leaders with a shared passion for delivering exceptional golf experiences for all – from elite touring professionals to new and aspiring entrants to the game. We've long seen the value in Topgolf and we are confident that together, we can create a larger, higher growth, technology-enabled global golf and entertainment leader. Callaway's strong financial profile will enable the combined company to accelerate innovation, develop exciting new products and experiences, and create compelling value for shareholders, while providing the dedicated teams of both companies more opportunities to showcase their talents and complementary capabilities."

"We are excited to join the Callaway family and strengthen the experiences we create at the intersection of sports and tech-driven entertainment," said Dolf Berle, Chief Executive Officer of Topgolf. "Fueled by a tremendous team of associates and a diverse offering across our venues, Toptracer, and media platform, Topgolf is truly changing the landscape of the industry by making golf more inclusive and accessible to people of all ages, demographics and skill levels. As part of Callaway, we plan to grow our leadership position by leveraging Callaway's brand reputation, industry relationships and financial strength to connect more communities around the world to the Topgolf experience."

**The Registration Statement Omits Certain Material Information**

26.    Defendants filed a materially incomplete and misleading Registration Statement

with the SEC, despite the Individual Defendants being obligated to carefully review the Registration Statement before it was filed and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  Therefore, the Registration Statement should be amended prior to the Shareholder Vote, so the Company's shareholders can make an informed voting decision in connection with the Proposed Transaction.

27.     First, the Registration Statement fails to provide critical information regarding the financial projections for Callaway and Topgolf.

28.     Specifically, the Registration Statement omits Net Income projections for Callaway and Topgolf, despite Defendants referencing Net Income for both throughout the Registration Statement. Registration Statement, 17-18, F-55.  Defendants elected to summarize the "Callaway Forecasts" and "Topgolf Forecasts," but excised and failed to disclose the readily available Net Income projections. By disclosing certain projections in the Registration Statement and withholding the Net Income projections, Defendants render the projections on pages 112-115 of the Registration Statement materially incomplete and misleading.  Simply put, Net Income projections are irreplaceable when it comes to fully, fairly, and accurately understanding a company's projections and value.

29.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all of one's cards on the table face-up. In this case, only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell*

*v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the projections, but have omitted the Net Income projections.

30.     Second, the Registration Statement omits critical information regarding the financial analyses conducted by Goldman Sachs in connection with the Proposed Transaction.

31.     Here, the Registration Statement discloses that Goldman Sachs considered "certain publicly available research analyst reports for Callaway" in rendering its opinion, but fails to disclose exactly which analyst reports were observed by Goldman Sachs. Registration Statement, 105.

<u>Financial Analyses of Callaway (Standalone)</u>

32.     With respect to the *Selected Companies Analysis*, the Registration Statement fails to provide the individual multiples observed by Goldman Sachs for each of the selected companies. *Id.* at 106-07.

33.     Regarding the *Illustrative Present Value of Future Share Price Analysis*, the Registration Statement omits the following information: (i) the inputs and assumptions underlying Goldman Sachs' application of an illustrative range of next 12 months' EV/EBITDA multiples of 11.0x to 13.0x to the estimated standalone next 12 months' Callaway Adjusted EBITDAS at the end of each of the fiscal years 2021 to 2024 – used to determine Callaway's illustrative enterprise values; (ii) Callaway's illustrative enterprise values; (iii) Callaway's net debt; (iv) the inputs and assumptions underlying the illustrative discount rate of 8.7% (reflecting an estimate of the standalone cost of equity for Callaway); and (v) the inputs and assumptions underlying the applied illustrative range of next 12 months' EV/EBITDA multiples of 9.0x to 11.0x to the estimated standalone next 12 months' Callaway Adjusted EBITDAS at the end of each of the fiscal years

2021 to 2024 – used to determine the illustrative enterprise values for Callaway. *Id.* at 108.

34.     As for the *Illustrative Discounted Cash Flow Analysis*, the Registration Statement fails to disclose the following information: (i) the inputs and assumptions underlying the discount rates ranging from 7.0% to 8.0% (reflecting estimates of Callaway's weighted average cost of capital); (ii) the range of illustrative terminal values for Callaway; (iii) the inputs and assumptions underlying the perpetuity growth rates ranging from 0.5% to 1.5% to a terminal year estimate of the free cash flow to be generated by Callaway – used to calculate the illustrative terminal values; (iv) the inputs and assumptions underlying the implied exit terminal year EV/EBITDA multiples ranging from 8.7x to 11.9x; (v) the inputs and assumptions underlying the 8.7% discount rate (reflecting an estimate of Callaway's cost of equity); and (vi) Callaway's NOLs for the fiscal years 2020 through 2021 ("NOL Forecasts"). *Id.* at 107-08.

<u>Financial Analyses of Callaway (Pro Forma for the Merger)</u>

35.     For the *Illustrative Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 8% to 10% (reflecting estimates of Callaway's pro forma weighted average cost of capital); (ii) a range of illustrative terminal values for Callaway pro forma for the Merger; (iii) the inputs and assumptions underlying application of exit terminal year EV/EBITDA multiples ranging from 14.0x-17.0x to a terminal year estimate of free cash flow to be generated by Callaway pro forma for the Merger used to calculate the terminal values; (iv) the inputs and assumptions underlying the perpetuity growth rates ranging from 4.3% to 6.8% (applying CAPM); and (v) the inputs and assumptions underlying the discount rate of 9.3% (reflecting an estimate of Callaway's pro forma cost of equity). *Id.* at 109.

36.     These key inputs are material to the Company's shareholders, and their omission

renders the summary of Goldman Sachs' two *Discounted Cash Flow Analyses* above incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  *For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).   Without the above-mentioned information, the Company's shareholders cannot evaluate for themselves the reliability of Goldman Sachs' *Discounted Cash Flow Analyses*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or were the result of an unreasonable judgment by Goldman Sachs, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

37.      Finally, for the *Illustrative Present Value of Future Share Price Analysis*, the Registration Statement omits: (i) the inputs and assumptions underlying Goldman Sachs' application of an illustrative range of next 12 months' EV/EBITDA multiples of 14.0x to 17.0x to the estimated next 12 months' Callaway Adjusted EBITDAS pro forma for the Merger at the end

of each of the fiscal years 2021 to 2024 using the Forecasts and the Synergies; and (ii) the inputs and assumptions underlying the discount rate of 9.3% (reflecting an estimate of pro forma cost of equity for Callaway pro forma for the Merger). Registration Statement, 109.

38.      In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision concerning whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act and Rule 14a-9)**

39.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40.      Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

41.      Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

42.    The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

43.    Defendants have issued the Registration Statement with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding: (i) the financial projections; and (ii) the valuation analyses performed by Goldman Sachs in support of its fairness opinion.

44.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

45.    The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve

and recommend the Proposed Transaction; indeed, the Registration Statement states that Goldman Sachs reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analysis provided by Goldman Sachs, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Goldman Sachs' analyses in connection with their receipt of the fairness opinion, question Goldman Sachs as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

47.     Callaway is also deemed negligent as a result of the Individual Defendants'

negligence in preparing and reviewing the Registration Statement.

48.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

## (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Callaway within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Callaway, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

53.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

### (Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of

candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Registration Statement did not omit any material information or contain any materially misleading statements.

58.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Registration Statement to be disseminated to Plaintiff and the Company's other public shareholders.

59.     The misrepresentations and omissions in the Registration Statement are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

60.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

     D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: December 22, 2020          **MONTEVERDE & ASSOCIATES PC**

                         */s/ Juan E. Monteverde*
                         Juan E. Monteverde (JM-8169)
                         The Empire State Building
                         350 Fifth Avenue, Suite 4405
                         New York, NY 10118
                         Tel:(212) 971-1341
                         Fax:(212) 202-7880
                         Email: jmonteverde@monteverdelaw.com

                         *Attorneys for Plaintiff*